IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Wiley Y. Daniel**

Civil Action No.  03-CV-02639-WYD-OES

DAVID R. PRICE

      Plaintiff,

v.

WILSON SPORTING GOODS COMPANY, a Delaware corporation; TARGET
CORPORATION, a Minnesota corporation; and TRUE TEMPER SPORTS, INC., a
Delaware corporation,

      Defendants.

---

**ORDER**

---

THIS MATTER is before the Court in connection with Plaintiff David R. Prices's

Motion for Partial Summary Judgment - as to Liability on His First Claim for Relief (Strict

Product Liability) and Third Claim for Relief (Negligence), Against Defendant Wilson

["Motion for Partial Summary Judgment"], filed February 9, 2005.

I.    **BACKGROUND**

Plaintiff owns a set of Wilson Ultra golf clubs allegedly purchased at Target in

September of 2001.  Pl.'s Mot. for Partial Summ. J., at 2.  While golfing with his son and

nephew on April 28, 2002, Plaintiff was struck in the head by the club head of the

Wilson Ultra pitching wedge.  *Id.,* at 2-3.  This incident occurred when Plaintiff's son

swung at the ball while teeing off on the ninth hole.  *Id.,* at 2.  The head of the pitching

wedge separated from the shaft of the club and struck Plaintiff where he was standing

approximately 20 yards to the side, and 10 to 20 yards in front of the tee-box.  *Id.* at 3.

As a result of the impact, Plaintiff suffered injuries including momentary unconsciousness, severe head lacerations, and an "open depressed skull fracture with underlying bruising of the brain." *Id.* at 3.

Plaintiff asserts five claims for relief against Defendant Wilson Sporting Goods Company ["Wilson"], two of which are at issue in the Motion for Partial Summary Judgment: a claim for strict liability which alleges manufacture of a defective pitching wedge; and a claim for negligence in the manufacture of the pitching wedge. Second Amended Compl., at 5-7, 8-9. Plaintiff filed his Motion for Partial Summary Judgment on February 9, 2005. Wilson filed a Memorandum Brief in Opposition to Plaintiff's Motion for Partial Summary Judgment ["Brief in Opposition"] on March 16, 2005 which was stricken from the record by Minute Order, dated March 21, 2005.

## II.   SUMMARY JUDGMENT

Summary judgment is appropriate where "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Koch v. Shell Oil Co.,* 52 F.3d 878, 880 (10th Cir. 1995). The burden is on the party making the motion to "show the absence of a genuine issue of material fact." *Otteson v. United States*, 622 F.2d 516, 519 (10th Cir. 1980). "[T]he pleadings and other documentary evidence must be construed in favor [of the nonmoving party.]" *Id.* The nonmoving party must go beyond the pleadings and present "significant probative evidence tending to support" the pleadings. *White v. York Int'l. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995) (internal citations omitted). Summary judgment should be granted "against a party who fails to make a showing sufficient to establish . . . an element essential to that party's case."

2

*Celotex Corp. v. Catrett.*, 477 U.S. 317, 322 (1986).

In determining if Plaintiff's Motion for Partial Summary Judgment should be granted, I turn first to Wilson's failure to disclose expert witness testimony in accordance with FED.R.CIV.P 26.  Plaintiff avers that because Wilson has made no expert disclosures as required by Rule 26(a)(2)(B), Plaintiff's expert testimony is uncontradicted.  I find merit in Plaintiff's argument, as Plaintiff submitted expert testimony in accordance with the requirements of Rule 26(a)(2)(B), and Wilson submitted no expert testimony.

Rule 26(a)(2)(B) requires that the parties disclose expert witness testimony in the form of a written and signed report containing certain specified information, either in accordance with the deadlines set in a Scheduling Order, or within 90 days of trial if there is no set deadline.  Specifically, Rule 26(a)(2)(B) requires that the report

> ". . . contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years."

In the case at bar, not only did Wilson fail to comply with the specific disclosure requirements, it failed to disclose *any* expert witness testimony by the December 30, 2004 deadline.[1]  Pl.'s Mot. for Partial Summ. J., at 5-6; Pl.'s Mot. for Entry of Order

---

[1] The original deadline for disclosure of experts and rebuttal reports was December 15, 2004. Scheduling Order of May 10, 2004.  This deadline was extended to December 30, 2004 by Minute Order on October 19, 2004.  FED.R.CIV.P. 16(b) "provides that a deadline established in a scheduling order . . . may be extended . . . 'upon a showing of good cause and by leave of the district judge.'" *Washington v. Arapahoe County Department of Social Services*, 197 F.R.D. 439, 440-41 (D. Colo. 2000).

Granting Summ. J., at 2.  The record further reflects that, as of the filing of its Brief in

Opposition on March 16, 2005, Wilson has yet to provide any disclosures.[2]

I turn next to Wilson's failure to file a timely response to Plaintiff's Motion for

Partial Summary Judgment.  Wilson's Brief in Opposition was stricken by this Court for

being untimely[3] and for failure to comply with Section VI.2 of the Hearing, Conference

and Trial Procedures.  Wilson was given leave to refile its Brief in Opposition along with

an appropriate motion for leave to file out of time.  To date, Wilson has not taken

advantage of this opportunity.  Therefore, for the purpose of this decision, Wilson has

not responded to Plaintiff's Motion for Partial Summary Judgment.  Because Wilson has

failed to set forth any specific facts, either in the form of a response, or in the form of

expert testimony, that would demonstrate a genuine issue for trial, it would not be

inappropriate to grant summary judgment in favor of Plaintiff.[4]  However, even where

---

[2] I reach this conclusion based on the fact that Wilson did not submit any expert testimony in support of its Brief in Opposition.

[3] Plaintiff filed the Motion for Partial Summary Judgment on February 9, 2005.  According to D.C.COLO.L.CIVR 56.1, Wilson had 20 days in which to file a response, therefore, any brief in opposition should have been filed with the court by March 1, 2005.  Wilson's Memorandum Brief in Opposition was filed March 16, 2005, without any motion for an extension or motion to file out of time.

[4] In *Jordan F. Miller Corp. v. Mid-Continent Aircraft Service, Inc.*, 173 F.3d 863 (10th Cir. 1999) (*per curiam*) (unpublished opinion), the Tenth Circuit discussed in *dicta* the final order of the district court granting partial summary judgment in favor of the defendants when the plaintiff failed to establish an essential element of its claim due to lack of expert testimony.  Miller alleged negligence, breach on contract, and breach of warranty arising out of its purchase of a used Cessna aircraft.  Because Miller failed to comply with the requirements for expert testimony disclosure under Rule 26(a)(2)(B) in its claim alleging defects in the right engine of the aircraft, the district court struck the expert testimony.  The district court then granted partial summary judgment in favor of the defendants on the grounds that Miller, without the testimony of its expert, had failed to establish causation.  The Tenth Circuit denied Miller's *mandamus* petition seeking to have the partial summary judgment withdrawn and to allow the expert to testify.  *See also Svendsen v. Robinson, M.D.*, 94 P.3d 1204 (Colo. App. 2004) (upholding summary judgment where plaintiff failed to disclose expert testimony necessary to establish standard of care in claim for medical malpractice); *Terrell v. Walter E. Heller & Company,* 439 P.2d 989 (Colo. 1968) (defendant's "affirmative showing of specific facts probative of its right to judgment, uncontradicted by any counter affidavits submitted by the [plaintiffs], left the trial court with no alternative but to conclude that no genuine issue of material fact existed").

there is a total lack of response by the adverse party, Rule 56(e) requires that I examine the record in its entirety and determine if summary judgment in favor of Plaintiff is appropriate.[5]

In support of his claims, Plaintiff has tendered Bastiaan E. Cornelissen, Ph.D., P.E. and Chester S. Shira, P.E. as expert witnesses on the cause of the separation of the head of the pitching wedge from the shaft.[6]  I have examined the experts' reports submitted by Plaintiff and conclude that the reports satisfy the requirements of Rule 26(a)(2)(B).  Because of Wilson's failure to respond to Plaintiff's Motion for Partial Summary Judgment, the allegations and testimony set forth therein are deemed to be uncontested.  I now turn to whether Plaintiff's unchallenged allegations and expert testimony establish that there are no genuine issues for trial on his claims for strict product liability and negligence against Wilson.

## III.   STRICT PRODUCT LIABILITY

The Supreme Court of Colorado, sitting *en banc*, expressly adopted the doctrine of strict product liability in tort stated in § 402A of the Restatement (Second) of Torts in *Hiigel v. General Motors Corporation,* 544 P.2d 983, 987 (Colo. 1975).  § 402A provides:

---

[5] FED.R.CIV.P 56(e) provides, in part, that "[w]hen a motion for summary judgment is made and supported as provided in this rule . . . the adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, *if appropriate*, shall be entered against the adverse party" (emphasis added).

[6] Cornelisson is an engineer who specializes in forensic engineering and "the investigation of failures of engineered materials and devices."  Cornelisson CV, Pl.'s Mot. for Partial Summ. J., Ex. 10. Shira is an engineering consultant who specializes, among other things, in providing expert testimony in golf litigation, and conducting "failure analysis for iron-base, high-temperature, aluminum, copper, and corrosion-resistant alloys."  Shira CV, Pl.'s Mot. for Partial Summ. J., Ex. 11.  Both Cornelisson and Shira presented their reports on November 30, 2004, the deadline set by the Minute Order of October 19, 2004 for Plaintiff to disclose expert testimony.

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold."

Strict product liability rests upon the "'concept of enterprise liability for casting a defective product into the stream of commerce.'" *Hiigel*, 544 P.2d at 988 (quoting 2 L. Frumer & M. Friedman, Products Liability 16A(4)). The focus in strict liability rests not on the conduct of the manufacturer,[7] but rather on the nature of the product they are selling to the consumer. *Id.* This doctrine stated in Restatement (Second) of Torts § 402A is reflected in the Colorado civil jury instructions for strict product liability. I therefore see no conflict with Plaintiff's reliance upon the Colorado jury instructions to establish the elements of his claim for strict liability.

To satisfy his burden of showing that there is no genuine issue of material fact for trial as to Wilson's strict liability, Plaintiff must make a showing sufficient to establish the essential elements of his strict liability claim. *Celotex*, 477 U.S. at 322. The Colorado civil jury instructions outline ten elements of strict product liability for a trier of fact to examine in order to determine if a manufacturer is strictly liable for a defective product.[8] Those elements are as follows:

1.  Wilson was a manufacturer of the pitching wedge;
2.  Wilson was engaged in the business of selling such pitching wedges for

---

[7] RESTATEMENT (SECOND) OF TORTS § 402A(2): "The rule stated in Subsection (1) applies although (a) the seller has exercised all possible care in the preparation and sale of his product."

[8] Where it is found to be appropriate, questions regarding liability in tort traditionally left to juries may be decided by a judge "as a matter of law . . . when reasonable minds could draw but one inference from the evidence." *Walcott v. Total Petroleum, Inc.*, 964 P.2d 609, 612 (Colo. App. 1998).

6

resale, use or consumption;

3.  Wilson sold the pitching wedge;

4.  The pitching wedge was defective[9] and that, because of the defect, the pitching wedge was unreasonably dangerous[10] to a person who might reasonably be expected to use, consume, or be affected by the pitching wedge;

5.  The pitching wedge was defective at the time it was sold by Wilson or left its control;

6.  The pitching wedge was expected to reach the user or consumer without substantial change in the condition in which it was sold;

7.  The pitching wedge did reach the user or consumer without substantial change in the condition in which it was sold;

8.  Plaintiff was a person who would reasonably be expected to use, consume or be affected by the pitching wedge;

9.  Plaintiff had injuries; and

10. The defect in the pitching wedge was a cause of Plaintiff's injuries.

COLO.JURY INSTR., CIVIL 14:1

If Plaintiff has not satisfactorily demonstrated the validity of one or more of the above

ten statements, a genuine issue of material fact remains for trial, and summary

judgment should not be granted.  If, however, Plaintiff's evidence successfully

demonstrates that all of the above ten statements are true, he will have established that

there are no genuine issues of material fact as to Wilson's liability, and that he is

---

[9] A defective product is one that is, "at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him." RESTATEMENT (SECOND) OF TORTS § 402A, comt. g (1965).  "The plaintiff need only show a reasonable probability that the product was defective when it left the defendant's control, and need not negate all possible causes of a product's malfunction other than a defect attributable to the manufacturer."  63 AM. JUR. 2D, *Products Liability* § 12 (2004).

[10] An unreasonably dangerous product is one that is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."  RESTATEMENT (SECOND) OF TORTS § 402A, comt. i (1965). *See also* COLO. JURY INSTR., CIVIL 14:3 *Defective, Unreasonably Dangerous – Defined* (2004) ("A product is unreasonably dangerous because of a defect in its manufacture if it creates a risk of harm to persons or property that would not ordinarily be expected.").

entitled to a judgment as a matter of law.[11]


    A.   <u>Plaintiff's Argument for Strict Liability</u>

Absent a response from Wilson, the record, as it stands, consists of Plaintiff's motion, brief and submitted evidence.  Upon review of that record, I find that Plaintiff has supported all of the foregoing ten elements with factual evidence, testimony or affidavits.

Plaintiff has shown that Wilson was the manufacturer of the pitching wedge. There is photographic evidence presented by Cornelisson showing the head of the pitching wedge in which the "Wilson" logo and name, "Ultra" name, and "PW" designation can be clearly seen on the head of the pitching wedge.  Cornelisson Report of Jan. 29, 2003, Pl.'s Mot. for Partial Summ. J., Ex. 10.  Furthermore, Plaintiff presents photocopies of the product/shipping label from the box in which the golf clubs were sold indicating a "Wilson Ultra Package Set."  Pl.'s Mot. for Partial Summ. J., Ex. 2.

Plaintiff has shown that Wilson was engaged in the business of selling such pitching wedges for resale, use or consumption.  By answer to Plaintiff's written requests for admission, Wilson admitted to engaging in the business of selling Wilson Ultra golf clubs for resale.[12]  Pl.'s Mot. for Partial Summ. J., Ex. 3, Resp. to Req. for Admis. No. 3.  "Defendant Wilson [sic] that it is engaged in the business of designing,

---

[11] "A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages."  FED.R.CIV.P. 56(c).

[12] The admission reads: "It is admitted that Wilson Ultra golf clubs sold at Target were designed, assembled and shipped to Target by Wilson."  Target is a retail store, and from that, one can conclude that Wilson was in the business of selling golf clubs for resale use in at least one retail store.

manufacturing and selling sporting equipment, including golf clubs, and admits that it

sold golf clubs of the type which is the subject matter of this litigation."  Def. Wilson and

Targets' Answer to Pl.'s Compl. ["Answer"], at 2 ¶ 4.

Plaintiff's evidence shows that Wilson sold the pitching wedge.  Support for this

conclusion is found in the form of the product/shipping label on the box of golf clubs,

indicating they were sold by Wilson, as well as the simple fact that the product was

released by Wilson into the stream of commerce at some point in time in order for

Plaintiff to have purchased the clubs.

Plaintiff has shown, through use of expert testimony, that the pitching wedge was

defective and that, because of the defect, the pitching wedge was unreasonably

dangerous to a person who might reasonably be expected to use, consume, or be

affected by the pitching wedge.  The expert reports presented by Cornelisson and Shira

both state that the pitching wedge was defective because the epoxy used to connect the

shaft to the head hosel was not evenly distributed,[13] and the grinding of the end of the

shaft in order to make the connection was both deeper than required and exposed

above the hosel.[14]  Both experts also note a potential welding defect, that, if confirmed

---

[13] Cornelisson examined both the pitching wedge, and a 4-iron from the same set that had broken previously.  Upon examination, he found that the epoxy bonds were defective due to large gaps and cracks, lack of fill between the exterior of the shaft and the interior of the hosel, and exposure of ground portions of the shaft above the hosel.  Cornelisson Report, Nov. 30, 2004 ["Cornelisson Report"], at 6.  He states that the uneven distribution of epoxy "weakened the bonds and created abnormal stress distributions during use of the clubs."  *Id.*  Shira found that the resultant gaps in the epoxy were not commensurate with "good adhesive bonding practice."  Shira Report, Nov. 30, 2004 ["Shira Report"], at 2-3.

[14] While some grinding of the shaft is necessary to improve the strength of the epoxy bond, "the structural integrity of the club is significantly compromised by removal of shaft base metal and the creation of a sharp grinding marks in the exposed surface."  Cornelisson Report, at 6.  During his examination, Cornelisson found sections of the shaft adjacent to the fracture where the plating had been completely removed by the grinding process, and observes that "thin-walled, light-weight tubing . . . does

by further testing, would also be indicative of defective manufacturing.  Shira Report at 4, Cornelisson Report, at 5.  Both experts also state that the club did not show any signs of improper use or abuse.  Cornelisson Report, at 7; Shira Report, at 1.  Lastly, the defect in the club posed an unreasonable danger to the Plaintiff: "the structural integrity of the club is significantly compromised by removal of shaft base metal and the creation of sharp grinding marks in the exposed surface."  Cornelisson Report, at 6.  It is not likely that an ordinary golfer such as Plaintiff would recognize the defects in the pitching wedge.  Cornelisson Report, at 7.  Furthermore, the defects were not readily observable because of a plastic ferrule that "obscured the view of the critical areas immediately above the hosels."  *Id.*

Plaintiff has demonstrated that the pitching wedge was defective at the time it was sold by Wilson or left its control.[15]  According to the Shira and Cornelisson reports, the defects in the club are typical of manufacturing defects, not of improper use or abuse.  In their reports, both Shira and Cornelisson speak of the defects noted during examination as having occurred during the manufacturing and assembly process.  Shira Report, at 2-4; Cornelisson Report, at 5-6.  Cornelisson outright states that the defects

---

make the shaft more prone to sudden fracture in the presence of notches or other stress concentrations [such] as the grinding marks generated during the tip preparation process."  *Id.,* at 5.  Shira reports "excessive and aggressive grinding," observing that the chromium plating was completely removed, the steel surface was rough, and that the process used was probably not in accordance with common industry practice.  Shira Report, at 4.

[15] In *Blueflame Gas, Inc. v. Van Hoose*, 679 P.2d 579 (Colo. 1984), the Colorado Supreme Court, sitting *en banc*, held that a plaintiff's burden of proof a strict liability that a product was defective when it left the control of the manufacturer is "limited to proof that the defect which rendered the product unreasonably dangerous to the user or consumer occurred in the course of the distribution process and before the plaintiffs purchased the product."  *Id.* at 591. The plaintiff can satisfy this burden with evidence showing that "the product was defective and unreasonably dangerous when purchased or when put to use within a reasonable time after purchase."  *Id.*

noted in the pitching wedge were manufacturing defects.  Cornelisson Report, at 7.

Furthermore, the clubs were relatively new at the time of the accident,[16] indicating that

the defect likely originated with the manufacturer, not the Plaintiff.

Wilson admits that Wilson Ultra golf clubs were "distributed with the purpose of

reaching consumers without substantial change."  Pl.'s Mot. for Partial Summ. J., Ex. 4,

Resp. to Req. for Admis. No. 1.  Lacking any evidence to the contrary, I presume that

the clubs reached Plaintiff in the same condition in which Wilson released them into the

stream of commerce.  Plaintiff has evidence that he purchased the clubs along with the

box in which they were shipped, and received the warranty information along with the

clubs.  Shira and Cornelisson state that the clubs show no evidence of abuse.  Even if

Plaintiff bought them second hand, they still reached Plaintiff in relatively the same

condition in which they were manufactured.

Plaintiff was a person who would reasonably be expected to use, consume or be

affected by the pitching wedge.  Plaintiff was a regular golfer[17] and, thus, likely to be

using a pitching wedge.  As for the fact that it was Plaintiff's son who actually swung the

club during its fracture, I find it is not unusual for golfers grouped together in any

particular round to share clubs.  Accordingly, I find that Plaintiff is a person who would

reasonably be expected to either use the clubs or, as a result of sharing clubs with

---

[16] Without contradictory evidence, I presume the alleged purchase date of September 2001 asserted by the Plaintiff to be accurate, making the club seven to eight months old at the time of the incident in question.

[17] Plaintiff's nephew, Aaron Hill, states that he played golf with Plaintiff and Plaintiff's son "most weekends," indicating that Plaintiff golfed quite frequently.  Aff. of Aaron Hill, Pl.'s Mot. for Partial Summ. J., Ex. 6.  Plaintiff states that he and his son went golfing with the set of clubs in question between 6 and 12 times prior to the incident in April 2002.  Aff. of David R. Price, Pl.'s Mot. for Partial Summ. J., Ex. 1.

others in his threesome, be affected by their use.

The record before the Court clearly indicates that Plaintiff was severely injured when he was struck by the head of the pitching wedge.  Pl.'s Mot. for Partial Summ. J., Ex. 8.  "The combined effect of the reduced diameter and presence of stress concentrations led to the fracture of the clubs under conditions of normal use." *Cornelisson Report,* at 4.  The defects in the manufacture of the pitching wedge were a causal factor in the injury to Plaintiff; had the club not been defective, the shaft would not have fractured, the head would not have broken off, and Plaintiff would not have been struck.

I conclude that Plaintiff has satisfactorily demonstrated there is no genuine issue of material fact for trial regarding Wilson's strict liability in tort for manufacturing a defective pitching wedge.  Plaintiff has made an affirmative showing of specific facts probative of Wilson's liability in strict tort.  This showing is uncontradicted by Wilson due to its failure to timely file a response, to refile a response, and to disclose expert testimony in accordance with Rule 26(a)(2)(B).  Based on the evidence submitted, I believe that reasonable persons could draw only the following inferences: that the pitching wedge suffered from a manufacturing defect; that the defect created an unreasonable danger to the Plaintiff; and that the defect was a cause of Plaintiff's physical injuries.  I therefore conclude that summary judgment should be entered in favor of Plaintiff on his first claim as to Wilson for strict product liability.

**IV.    NEGLIGENCE**

Under Colorado law, the elements of a claim for negligence are "a duty owed by

the defendant to the plaintiff, a breach of that duty, injury to the plaintiff, and a proximate cause relationship between the breach and the injury." *Casebolt v. Cowan*, 829 P.2d 352, 356 (Colo. 1992).   The appropriate standard of care is that of "reasonable care in light of the apparent risk." *Id.*  The existence of a duty of care is a question of law. *Shaw v. General Motors Corporation*, 727 P.2d 387, 389 (Colo. App. 1986).   The question of imposing a duty of reasonable care is essentially one of fairness; would reasonable persons recognize a duty and agree that one exists.  *Casebolt*, 829 P.2d at 356 (citing *Taco Bell v. Lannon*, 744 P.2d 43 (Colo. 1987)).   The following factors should be considered: (1) the risk involved; (2) the foreseeability of injury weighed against the social utility of Wilson's conduct; (3) the magnitude of the burden of guarding against injury; and (4) the consequences of placing that burden on Wilson. *Shaw,* 727 P.2d at 389; *Casebolt*, 829 P.2d at 356.

     First, I find there is a recognizable risk of serious injury in the event a defective golf club fractures and the head of the club detaches.  I also find that the risk involved outweighs the social utility of Wilson's conduct; the need to protect consumers from injury due to product defects is far greater than the need to protect Wilson's ability to produce golf clubs for public consumption.[18]  Furthermore, I find that the duty of guarding against injuries like the one suffered by Plaintiff "should appropriately be placed upon the entity that designed the final product, arranged for acquisition of all the component parts, and directed their assembly."  *Shaw*, 727 P.2d at 389.  Thus, I

---

[18] It is not necessary that the pitching wedge be inherently dangerous.  "It is enough that the chattel, if not carefully made, will involve such a risk of harm."  RESTATEMENT (SECOND) OF TORTS § 392, comment d.  "It is not necessary that the risk be a great one, or that it be a risk of death or serious bodily harm[; a]ll that is necessary is that the risk be an unreasonable one."  *Id.*

13

conclude that Plaintiff was entitled to protection as a matter of law, and that Wilson

owed Plaintiff a duty of reasonable care in the manufacturing of the pitching wedge.

To establish Wilson was negligent, Plaintiff must show all of the following by a

preponderance of the evidence:

1. Wilson manufactured the pitching wedge;
2. Wilson was negligent by failing to exercise reasonable care to prevent the pitching wedge from creating an unreasonable risk of harm to one who might reasonably be expected to use or be affected by the club while it was being used in a manner Wilson might have reasonably expected;
3. Plaintiff was one of those persons Wilson should reasonably have expected to use or be affected by the pitching wedge; and
4. Plaintiff had injuries that were caused by Wilson's negligence, while the pitching wedge was being used in a manner Wilson should reasonably have expected.

COLO.JURY INSTR., CIVIL 14:17 (2004).

Here, I find that Plaintiff has failed to meet its burden.  Specifically, Plaintiff fails to

establish by a preponderance of the evidence, even where Plaintiff's evidence is

uncontested, that Wilson breached its duty of reasonable care to prevent the pitching

wedge from creating an unreasonable risk.  While Plaintiff's experts' opinions note that

the defect occurred during the manufacturing and assembly process, the question of

whether Wilson was negligent when manufacturing and/or assembling the club is one

for the trier of fact.  Moreover, Plaintiff has not satisfactorily demonstrated that the

pitching wedge was being used in a manner Wilson might have reasonably expected.

The issue of whether Wilson should have reasonably expected Plaintiff, or someone like

Plaintiff, to be standing in front of a golfer swinging a club is a factual question.  Lastly, I

find Wilson's asserted affirmative defenses also raise genuine issues of material fact on

Plaintiff's negligence claim.  Thus, I conclude genuine issues of material fact exist as to

Wilson's liability in tort for negligence in manufacturing a defective pitching wedge.

**V.    CONCLUSION**

Accordingly, for the reasons stated in this Order, it is

ORDERED that Plaintiff's Motion for Partial Summary Judgment - as to Liability

on His First Claim for Relief (Strict Product Liability) and Third Claim for Relief

(Negligence), Against Defendant Wilson, filed February 9, 2005, is **GRANTED in part**

**and DENIED in part**.  The Motion is **GRANTED** as to Plaintiff's First Claim for strict

product liability and is **DENIED** as to Plaintiff's Third Claim for negligence.

Dated: July 18, 2005

                              BY THE COURT:


                              s/ Wiley Y. Daniel
                              Wiley Y. Daniel
                              U. S. District Judge